May it please the Court, I am Matt Adams with Northwest Immigrant Rights Project, the Petitioner Mr. Manliki, and I will seek to reserve three minutes for rebuttal. Recent cases from this Court have clarified that the Court retains jurisdiction to review the issues presented by Mr. Manliki in his petition. First with regards to his claim that the Board erred in denying his application for relief under the Convention Against Torture, both the decisions in Morales v. Gonzales and then on recurring in Ramadan v. Gonzales demonstrate that notwithstanding the purported jurisdictional stripping provisions of Section 242 of the Act, this Court can review the questions of law that are presented, and those questions of law include the application of law to the undisputed facts. In Ramadan, the Court recognized that the legislative history of Real ID demonstrates that Congress did not intend to bar review of questions of law, including mixed questions of law and fact, that previously could have been brought before a district court on a habeas petition. And thus while the Respondent cites the older cases like Matt's suit that were prior to Real ID that said that the Court of Appeals did not have jurisdiction, that is because at that time, pursuant to Flores v. Merrimon, based on the Supreme Court's decision in St. Louis, the Court did not have jurisdiction to bring a district court on a habeas petition. But I understood your beef, if you will, was really that the incorrect standard was used in terms of termination of serious crime, correct? That is with regards to the application for relief of withholding of removal under the Immigration and Nationality Act that the government applied, or rather the immigration judge applied the incorrect standard. But as to the application for relief under the Convention against Torture, our contention is that the immigration judge and board erred in finding that the Respondent did not meet his burden of proof in demonstrating that it was more likely than not that he would be tortured by the government or at the acquiescence of the government if returned to Nigeria. And pursuant to the Real ID law, the Court did not have jurisdiction to bring a district court on a habeas petition. And I believe that's correct. Okay. So that's why you're mixing me up. Because I thought, you know, you're talking, you're going down the road about whether there's jurisdiction stripping and all these complicated things. And it seemed that we could put CAD over there and deal with it, and then we had to deal with your serious crime contention separate. Am I correct in that regard? I believe that is correct. Okay. Okay. Just want to make sure I'm saying that. And I, in my arguments, prepared to first address the CAD claim. All right. And that's why I focused on that. As to the merits of the CAD claim, the Board sustained the immigration judge's finding that he had not demonstrated that he had experienced past torture. And also that he had not demonstrated that the government was either involved or at a minimum acquiesced to any such offensive conduct. And we would argue that the immigration judge erred in focusing solely on the injuries that he suffered when he was hacked in the shoulder by a machete and then later shoved down a flight of stairs while he was in shackles. Although those led to significant injuries, those are two of the more minimal factors that he presented in his claim that he had experienced past torture. The immigration judge and the Board, in making their determination, either failed entirely to evaluate other factors or easily dismissed them. For example, in looking at the fact that he was kidnapped and detained over a year, the immigration judge summarily concluded that that did not constitute torture. But the immigration judge did not examine the conditions of his torture and did not combine, take into consideration all the events that were brought before the court's attention. One of the things the Board relied on was an assertion, I believe, in the February 9th quarter, if I'm not mistaken, that there was no demonstration that the government was either responsible or acquiesced in the disappearances, mutilations, etc. regarding the family members. What is your response to that, that reason, as opposed to the reason of the past torture? The court, in the February 9th quarter, and also in the detailed declarations, submitted evidence through his testimony that he was detained by the Bokasi Boys, which were vigilante boys that acted, rather, a vigilante group that acted at the behest of the government. He testified that the PDP, the ruling political party, utilized the Bokasi Boys to destroy their political opponents. How does that relate to the things that happened to his family members? Is there evidence that the same group was responsible for the killings of his family members? He testified that it was the Bokasi Boys that detained him, that kept him free. His family members. Was there evidence about his family members? Right. In his detention, he testified that they threatened him and his family members. And it was because of these threats that he, when his parents were murdered, it was clear who had done the murder. Moreover, when he submitted his motion to remand, he submitted additional documents, including a threatening letter from the Bokasi Boys and a letter threatening future harm to the family, in addition to the documents demonstrating that his two brothers had been killed and mutilated. And he didn't need to rely only on his own testimony. He submitted reports from the Department of State, from Amnesty International, and the these vigilante groups to carry out their will and to maintain and establish power in their area. And, in fact, the reports specifically named the Bokasi Boys. Now, the Board indicates that they have discounted these documents as not having been properly verified and none of them were originals. How do you respond to that? We respond on three different levels. First of all, as to the requirement that they weren't properly authenticated or weren't originals. This Court has already made clear in its case law that the Board cannot require or the immigration judge can't require documents to be authenticated in this administrative setting where the rules of evidence do not apply and where these individuals, like Mr. Maliki, appeared pro se, without any legal representation. And, moreover, he was never given any instructions about what he should do or how he should properly submit these documents to the Board. Also, like in the case of Bassim from this Court, the Court makes specific mention of motions that are subsequently submitted and saying that the Court, in reviewing a motion to reopen or a motion to remand, must give these documents a value, must accept them unless they're inherently unreliable. And just like in Bassim, the Court noted it's especially incongruent for the Board to question the authenticity of these documents when the Court's already accepted his testimony as credible and has already accepted the previous documents, the previous death certificates and police reports and medical reports that he's filed. And so it doesn't – it is inconsistent now for the Board to question those, apart from the fact that the Board – if the Board felt that there were issues with these documents, that the Board should have done, has remanded the case to the immigration judge for further hearing on them. Would you just briefly outline all of the evidence that suggests that he would be currently tortured if he were returned? The first and primary factor that, through case law and the regulations, is looking at past torture. Well, let's forget about the past. Let's look at the present. Well, I think we – I say that because I think we know the record. Very well. The – the record demonstrates that the PDP, the People's Democratic Party, is in power and has these ties with vigilante groups like the Picasso Boys. Moreover, Petitioner is able to demonstrate that because of his ties to his family as the traditional ruling family in his community, that he's subjected – has already been subjected to threats and – and torture, and that continues to be – face imminent harm, given his family's control or – or traditional control over the communal lands and the rights to the property that include rights to a property where oil has been discovered. Moreover, apart from the past torture that he suffered, and while he was there on his motion to remand, he submitted additional documents demonstrating further deaths in his family and demonstrating threats of future harm to him or his family. Given his place in his society and his community, that he would inherit, as it were, the – the place of his father and have this traditional power in his land, if he's ever to return, he presents a threat to those who are now in power and those who now have control over the lands that his family previously exercised control. What's the latest country report that's in the record? The – the latest country reports that are in the record demonstrate that – Oh, I want to know the year. I believe it's 2001, but I need to go back and verify that because I'm not certain of that answer. If – if I may, one more point on the immigration judge's decision that the government did not acquiesce. The immigration judge, I believe, also made a mistake in stating that the fact that his father was able to free him is also, from his captivity, is also evidence that the government, local government, was not involved because the immigration judge mistook his father as a local government. And even though his father is a traditional ruler there, his father is not the political leader, is not in charge of the police department. It was not the police who rescued him. It was rather the fact that his father had henchmen of his own that he could send over to rescue him from – from his captors. And therefore, it was a mistake for the immigration judge to assert, one, that his father is the local government, and two, not to recognize that even if – which is not the case – even if his father at one time had been the local government, his father had clearly lost any political power that he once had. In fact, his father was – no longer even had the power to protect himself, as both of his parents were, while his mother was murdered and his father disappeared, presumably was also murdered. And this is another demonstration of how the immigration judge erred in finding that the The government – if I may, then, there's just a little bit of time left. I'll turn to the withholding of the modal. And like he said, in this court's decision in the treaty, clarifies that this court retains jurisdiction to review that at least the correct legal standard was applied in determining whether he had been convicted of a particularly serious crime. This case is even more stark than the case presented in a treaty. In a treaty, at least the immigration judge acknowledged the correct standard. The immigration judge sided with the Francescu requisites from the case of modal. Here the question is, I don't think that there's any requirement that the immigration judge state the Francescu word in order to apply the factors. And it seems like the key factors out of that case, which don't have to be applied one by one by one, were actually applied here, such as the nature of the conviction, the sentence, the specifics of the case in terms of the mental loss, and then threat to the community. So why wouldn't that satisfy these Francescu requirements? I would agree that it doesn't require the judge to say, no, Francescu. But the factors that those four requisite factors, including the key factor, only all the judge mentioned was that it was a bank fraud conviction and the length of sentence. The judge did not even mention the final and the most important factor, the one that was labeled the most important by both the Board and this Court, and that is whether the type and circumstances of the crime indicate that the alien will be a danger to the community. The judge failed to address that in our decision. The judge said that given the amount of the loss and the person's extensive record, that it would be a threat to the community. The court said the judge said that as a matter of discretion based on the amount of loss combined with the extensive history of fraud-related offenses, that Respondent's convictions qualify as a particularly serious crime. Isn't the pattern of fraudulent behavior a potential danger? Certainly, a pattern of fraud could create a conclusion that an individual presents a particularly, presents a danger to the community. But the judge didn't engage in that analysis. The judge only stated that he had a sentence of 16 months, it was bank fraud, and looked at his history of fraud. In Alfredi, I'm sorry, in Alfredi as well, the Court looked and accepted two of the factors, but the Court left out the other two factors. And that is similar to this case, where the judge did not look at the circumstances and underlying facts of conviction. There was no discussion in the analysis of what happened at, with this bank fraud conviction or how that demonstrates that he would be a future threat or harm to society. Thank you. May it please the Court, good morning. My name is Sue Harrison. I'm an assistant U.S. attorney in the Western District of Washington in Seattle. Your Honors, I'd like first to address the withholding and, in particular, the immigration judge's decision that Mr. Manleki had committed a particularly serious crime. I disagree with counsel. The immigration judge, Victoria Young, looked at numerous factors. One of the first things that there was no question in this case that Mr. Manleki, his last conviction was an aggravated felony, which sets it apart from a number of the cases that have questioned the issue of particularly serious crime. Mr. Manleki himself raised the issue, and he was the first one to say, I am not applying for asylum because I've committed an aggravated felony, which bars him from applying for asylum. And the judge looked at the record, including Mr. Manleki's own list of his convictions, and it shows that he entered the United States briefly in 1981, returned in 1982, where he obtained a college education and has a college degree from the United States. He received high school education, in his words, in the best schools in London. He was a very, very wealthy man. And notwithstanding that, in the ten years he was here until he was deported in 1993, he amassed five separate convictions, four for fraud-related offense, mostly credit card, and one for cocaine possession. He was deported in 1993. And I want to make sure I've got my – my chronology. He was deported in 1993 and returned to Sirleer, his hometown in Lagos, Nigeria, where he said he lived a very good life. They were the wealthiest – his father was the wealthiest man. They owned this extremely profitable commercial property. And as time went on, it was also clear there was oil on that land, and Kjell and Exxon were dealing with his father for the rights to work on that land for the oil. The government at the same time was doing the same thing. In any event – Counsel, I'd like to move you, if I may, to – I'd like to move to the cap plan, because just speaking for myself, that is the plan that it seems – I agree. – gives you the most difficulty. And in particular, I'm concerned by the BIA's comment that even if the documents are authentic, they don't see any reason why it would change the result. And, you know, I'm about one of the most deferential judges you're going to get towards the Attorney General's decisions and the BIA's decisions. But I have great difficulty with this one in so far as we have the murders of several family members, mutilations, disappearances, and threats against this person to be treated just like the ones who have now been murdered, disappeared, and mutilated. And I just don't understand how that is not the credible fear of torture. Your Honor, I agree with you in everything you've said, and particularly that this is the issue, the cat issue, I believe, and the issue in light of this evidence, and the fact that there was no adverse credibility finding. And I agree with all that. But looking back at the record, I want to point out two things. First, the past torture does not create a presumption of future torture. It's irrelevant one way or the other, actually. It's irrelevant. It can be relevant. It can be relevant. But it's clear that he was at least targeted for something unpleasant in the past, whether you call it torture or something far less. Something happened to him, and as you say, he was credited. And some really, really bad things happened to his family members. And I don't dispute any of that. And the question is, then, the real issue here is the government involvement. And when you look at the evidence, there is no question that the Picasso boys exist. And we'll accept the fact, the I.J. accepted, that he was kidnapped by the Picassos. And I am not going to quibble over whether he was tortured or not. He was held for over a year, and the I.J. thought that there were some inconsistencies. But that's not really the issue. The issue is, excuse me, whether this was State-sponsored or acquiesced to. And what we have is that the Picasso boys exist. And if you look at all the State Department reports, and Judge Fletcher, you asked the most recent country report, is 2005. And Mr. Manleki, in fact, submitted the majority of the State Department reports as well as the additional reports. And there is not a single thing in any of those reports, and I've done over and over them, I submit, Your Honor, that connects the Picasso boys with the PVP party at all. There is nothing that connects them with that. I go after criminals. What do they say about groups that are, on an ad hoc basis, torturing people? There's no question. And there's large amounts of them, Your Honor. And, in fact, Nigeria, if you look at the State reports, this is Nigeria. It's the most populous country in Africa. It has 250 ethnic groups. It's still trying to create a democracy. Sixty percent of the population is below the poverty level. There are a huge number of tribal and social issues, and the issue of land use, and particularly the natural resources, has created as a fulcrum for violence in that country. It may be that the Manlikis were subject to violence. And we accept that the Manlikis were subject to violence. But it was just as likely it was because of their wealth and status, where in the country reports over and over again, just a small handful of the elite have the wealth and everybody else poor. Let me ask you about some specific facts, though. One thing that troubles me about the I.J.'s opinion here is there are sort of a number of general platitudes about what you have to do, and then she picks two or three pieces of evidence. One, for example, that because he was rescued, it meant that, in effect, the government was taking care of him and the council was already assessed at that point. But on the acquiescence point, some of the testimony in the record, for example, it's agreed that the Apache boys do vigilante violence. But the petitioner testified that they were, in fact, controlled by the party in power, and we have to accept that, given no adverse credibility finding. And there was testimony that the military accompanied these vigilantes in visiting him. So there is actual testimony linking them to the government, even apart from the blind eye approach. Could you address that? Your Honor, and I want to go through each of the exhibits that Mr. Manleki presented, and what we have is that in his initial report to the police after he was rescued, if you look at that exhibit, which is the A.R. 713, he reports that he was kidnapped by, quote, some social group or secret cult, quote, unquote, and then referred to them as hoodlums. And he made the same report to the police. There was no connection there with the political party. And, Your Honor, with all respect, if under CAT, if all a person has to do, we accept his credibility that he was kidnapped by hoodlums and by Bokasi boys. But to then go the second step and just based on his words, say, and they are connected with the political party, the PDP, with no underlying evidence in any of the state reports or in any of his exhibits. If you look at the affidavits. Let me just stop you there. We only, we kind of get the record presented to us, so it's not so much us saying, well, you said that and it's okay. Isn't it incumbent on the immigration judge to say, look, you may be credible about getting this information, but you've got no basis to make this connection with the government. And I find that you're not credible on that point. And then we would take a look at it. So you, in effect, are asking us to impute what the IJ failed to do here. Well, in the first instance, the hearing was a very extensive hearing, and Mr. Manleiki had ample opportunity to question. And it was the government who certainly did cross-examine Mr. Manleiki, and the immigration judge listened to all of the evidence. But the problem, I mean, I'm having the same problem as Judge McEwen on this point. We have to take the testimony as credible. And starting at about page 698 or 700 is where he testifies about a relationship between the Casa Boys and the PDT, and that in his experience, there is a connection with the government, and the government sponsors, permits, etc. Why don't we have to take that as a given? Maybe it's not true all over Nigeria. Maybe it's not true all the time. But that's his testimony. He was credible. I'm troubled with that, Your Honor, because if that's the burden of proof under Cass, that all I have to do, you know, that he makes a connection, and that because he says there's a connection with the political party, then there is one, then the burden of proof becomes absolutely minimal. It's an assertion. We do accept his credibility. But there are certain, for example, as in Basin, unless inherently unbelievable, do we accept Mr. Manleki when he says the Bikasi Boys had voodoo powers and that they could read stones and look into the future? Do we accept his credibility when he talks about the Bikasi Boys getting their power from the devil? There's a point where I think that there's the fact finder is permitted common sense, and we don't. Well, yeah, but that's the point. The fact finder ought to say, you know, I might even have been with you up to there, but now you're talking about the devil and voodoo, and you've basically kind of unraveled your mission here, and I'm having trouble putting this all together and finding you credible. But you didn't do that. You know, we're after the fact like archaeologists, you know, and we're saying look at the evidence, and to us it doesn't seem like it all stacks up. But our archaeology expedition is kind of constrained by these rules. So I'm still having some trouble why she didn't make a finding, and if she didn't make a finding, then it's evidence. Well, Your Honor, I have trouble that she didn't make an adverse credibility finding. I mean, every once in a while, you know, it's not you take the facts as they're given to you. That's right. You just get handed a record by the IJ, and the Attorney General makes you, you know, bring it up here, but sometimes some are not as good as the others. And I agree, Your Honor, and I'm all new to the immigration side in any event, but I do think there's a point where if that's his religious belief, and it's his subjective belief, why would the immigration judge make an adverse credibility finding based on that? That doesn't make any sense. It's not relevant. Well, it may not make sense, but it's the record. Let me ask another question. If we were to say that deportation has to be deferred, what's the process later for the government to say, well, things are okay now in Nigeria, we're going to have another hearing, and we're going to send you back? What's the process? Your Honor, I don't know. I don't know. I have come over from the criminal side to take over some of these oil cases, and I apologize. I wish I knew the answer to that. Well, I wish I knew the answer, too. If you look at the 2005 and the 2004 state reports, and I did a number of summaries of them, they refer to the Pakossi boys, and they are true vigilante groups going after criminals. There is no connection with nothing, no reference. But these reports state the conditions have gotten much better, that the new President Obasanjano in 2004 raided two Pakossi boys detention centers, arrested the Pakossi boys. And so the government in that case, that's clear proof the government wasn't involved and arrested a number of the Pakossi boys. And it talks that the Pakossi boys and other vigilante groups in the southeast diminished during the year. And that's from the 2004 report. I think I don't want to, you know, I recognize that you're not an oil specialist because those are. Well, I don't want to. Right. I apologize. But if this were sent back because the IJ didn't take into account some of this information that was presented on the motion to reopen, then wouldn't it be possible to the government to present these newer country reports as well? Well, they're in the record. They were presented by Mr. Manleki. I mean, there may be additional evidence. I don't know. I agree, Your Honor. And I also question if it were remanded, wouldn't the immigration judge also be able to find that Mr. Manleki's aggravated felony, and particularly serious crime, would also predominate his hack claim as well, which I believe could. Well, is that the possibility? And that would just raise another issue, either for appeal or for the DIA. Well, it would be less of a factual appeal. It would be taking a different route. Exactly. Well, Counsel, my understanding of the law is that even if he were guilty of quite a serious crime, if he's going to get tortured or killed when he goes back, under CAT, you defer. And that's the point which I was making to you. Yes, Your Honor. And I read your recent, I can't remember the name of the case where you spoke about that. The case begins with B. I forget the name. Oh, I have. You have negative 17, but if you have a short sum-up, you're welcome to do that. I would like the Court, if you look at the record, other than Mr. Manleki's statement that the PDP is connected with the Bokasi boys, all of the evidence that he submitted refers to these people as land thieves, squatters, hoodlums. There is nothing in the evidence that he presented at the time the kidnapping and the murders took place that lists have any connection with the PDP or political parties, nothing. And if you look at all the State Department reports, every report that Mr. Manleki presented also from other groups, there is not a single connection in any of them of the Bokasi boys with the political party. They are a traditional vigilante group going after criminals and punishing them on their own. The Manlekis were a very, very wealthy family. They owned oil-rich and commercial-rich land. There were any number of reasons why they were subject to killings and violence, and the government is not the inevitable source of that. Thank you, Your Honor. It doesn't have to be the source. It has to be aware and do nothing. Yes, Your Honor. I agree. Okay. Thank you, counsel. You have a little bit of rebuttal time remaining, Mr. Adams. If I may, just really quickly. With regards to Respondent's assertion that there's nothing other than his testimony, first of all, the regulations are very clear that testimony is enough to establish a cat crime. This is because most individuals aren't as fortunate as Mr. Manleki. Mr. Manleki is the rare individual who has police reports, medical reports, and he has country reports that actually refer to his situation. Many individuals are fleeing here without anything, don't have any of these corroborating documents that he can report to. So his testimony in and alone is enough. But I would point out that the country reports say more than what's been referred to here. The Amnesty International report stated, and I quote, State-endorsed vigilante groups carry out hundreds of extrajudicial executions in the southeast of the country and were responsible for acts of unlawful detention, torture, and disappearance. That's at page 535 in the record. The Department of State likewise stated, quote, Vigilante violence increased throughout the country, particularly in Lagos, where he's from, and Onsha, where suspected criminals were apprehended, beaten, and sometimes killed, unquote. And both reports made specific reference to the Picasso boys. This is not an area where we need reliant testimony, but if we needed to, that is sufficient. The law makes that clear. And one other point that I'd like to make is that even without the materials that were submitted in the motion to remand, he is able to demonstrate that the immigration judge and the board erred in denying his relief under the Convention Against Torture. We would request that the board grant his petition, instruct the court, I'm sorry, that this court would grant his petition instructing the board to grant his request for relief under the Convention Against Torture. Because regardless of the materials that were in that motion to remand, he satisfied his verdict. He was able to demonstrate with credible testimony. Indeed, he's one of the fortunate individuals who was found credible. He had a story that could easily be verified given the prominence of his family. And the government did not even contend that his story was false. Thank you. Counsel, the case just argued is submitted. We appreciate very much, as I said earlier, the flexibility of counsel and the time and place of argument. And your arguments were very helpful to the panel. With that, we return.
judges: B. Fletcher, Graber, McKeown